[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-14041

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ROBERT BOOKER, SR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 3:20-cr-00026-CAR-CHW-2

_____

Before NEWSOM, KIDD, and HULL, Circuit Judges.

HULL, Circuit Judge:

After a jury trial, Robert Booker appeals his convictions for four drug-distribution and two firearm offenses, including possession of a firearm by a convicted felon.

On appeal, Booker argues that the district court abused its discretion (1) by admitting, under Federal Rule of Evidence 404(b), evidence of Booker's prior state drug convictions based on his guilty pleas entered pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970); and (2) by not giving his requested jury instruction. For the first time on appeal, Booker argues (1) the district court plainly erred by failing to question *sua sponte* a juror about potential bias; (2) the government improperly vouched for a witness; and (3) plain error occurred when the government introduced testimony about persons listed in Booker's ledger of drug debts.

After careful review of the record and the parties' briefs, we affirm Booker's six convictions.

## I. BACKGROUND

### A.    Indictment and Pleas

A federal grand jury charged Booker and two codefendants, Peter Lawrence and Gerrick Cooper, in a 12-count superseding indictment. Booker was charged with a count each of possession with intent to distribute methamphetamine, marijuana, alprazolam, and oxycodone, in violation of 21 U.S.C. § 841(a)(1)

and 18 U.S.C. § 2 (Counts Six, Seven, Nine, and Eleven); (2) possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Count Ten); and (3) possession of a firearm during and in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2 (Count Twelve).[1]

Codefendants Lawrence and Cooper pled guilty. Booker pled not guilty and proceeded to trial.

**B.    Trial Evidence**

At trial, Georgia State Patrol Trooper Ian Moremen and Walton County Deputy Sheriff Danny Foster testified about Booker's arrest as follows.

On September 22, 2019, Trooper Moremen saw a pickup truck speeding at 70 miles per hour in a 55 miles-per-hour zone on Highway 78 near Athens, Georgia and initiated a traffic stop. Defendant Booker was in the front passenger seat, and his codefendant Lawrence was driving. Booker's 17-year-old son was in the back seat.

Lawrence rolled down his driver-side window, and Trooper Moremen smelled a strong odor of marijuana. When Lawrence claimed not to have his driver's license, Moremen asked him to step out of the truck. Moremen saw a black backpack between

---

[1] At trial, the government dismissed Count Eight, a heroin-distribution charge, based on Lawrence's testimony that it was his heroin.

Booker's legs on the passenger-side floorboard.  Booker gave Moremen his driver's license and said they were traveling to Athens.

Trooper Moremen checked Lawrence's information, learned Lawrence had an active arrest warrant, and called for backup.  Once Deputy Foster arrived, Moremen placed Lawrence in custody.  Moremen then found a small pill container on the ground where Lawrence had been standing.  Inside the pill container were two "corner baggies" containing suspected heroin and cocaine.  According to Moremen, a "corner baggie" is a method of storing drugs inside a sandwich bag often used for sales or smaller concealment of narcotics.

Trooper Moremen had Booker and his son exit the truck so it could be searched.  Inside the truck, Moremen located the black backpack, which had been moved behind Booker's passenger seat.  The backpack contained a corner baggie of marijuana, a corner baggie of green pills that were oxycodone, two larger bags of marijuana, and a bottle of oxycodone prescribed to Booker.  Booker told the officers that the marijuana and everything in the backpack belonged to him.

In a wallet inside the backpack, Trooper Moremen found a piece of paper with a handwritten list of nicknames and numbers.  Moremen recognized the paper as a ledger that drug dealers often use to keep track of narcotic sales or money owed.

In the truck's glove box, Trooper Moremen found a loaded handgun.  On the ground, underneath the step rail on Booker's

passenger side, Moremen found a tinfoil ball containing a large quantity of pills believed to be Xanax (alprazolam) and Ecstasy.

Trooper Moremen seized a total of 984 grams, or a little over two pounds, of marijuana. Testing of the pills showed they contained alprazolam, methamphetamine, and oxycodone. Moremen took Booker into custody and Mirandized him. Booker admitted that he was a convicted felon.

The government also called a forensic chemist who had tested and identified the drugs found during the traffic stop and prepared a lab report.

Codefendant Lawrence then testified that Booker frequently traveled to Athens to sell drugs. Lawrence was Booker's life-long friend and was previously married to Booker's sister. On September 22, 2019, Lawrence was driving Booker's pickup truck from Atlanta to Athens in part to collect drug debts owed by "Ham and Big B," two nicknames on the drug ledger found in Booker's backpack. These individuals owed Booker money for marijuana, Xanax, and Ecstasy pills. When they left Atlanta, Booker was in possession of marijuana, Xanax, and Ecstasy.

Lawrence was "toting" the firearm as protection for Booker. When Trooper Moremen initiated the traffic stop, Lawrence handed the firearm to Booker, who put it in the glove box. Lawrence purchased the firearm at Booker's direction with money Booker provided, and he needed the firearm to protect Booker from being robbed while Booker was picking up drug proceeds.

The government showed Lawrence a photograph of the ledger found in Booker's backpack.  Lawrence identified several individuals listed on the ledger by nickname.  Lawrence said "Big B" referred to Antron Bishop and the "30,100" amount represented the money Bishop owed to Booker for marijuana and ecstasy pills. Lawrence identified "Lil D" as Darren Thrasher, "Lil E" as Booker's nephew, "Allah," as the person who cuts Booker's hair, and "Charlie" as Gerrick Cooper (the other codefendant in this case).

During cross-examination, Lawrence acknowledged he was facing a 15-year "mandatory minimum sentence" for the firearm offense to which he pled guilty.  Lawrence denied, however, that as part of his plea deal, he could further lower his sentence by cooperating with the government.  On redirect, the government asked Lawrence, "Isn't it true that your attorney . . . and I both came to an agreement [that] under no circumstances, the government will allow you or will submit to a 5K on your behalf? You'll serve 15 years? . . . At a minimum?"  Lawrence agreed.

After Lawrence's testimony, Booker's counsel requested a bench conference and pointed to language in Lawrence's plea agreement regarding a possible § 5K1.1 motion for substantial assistance to the government and the potential for a sentence below the mandatory minimum.  The government explained that the language was "left in there by mistake" and asserted that Lawrence's 15-year plea deal did not include a sentence reduction. The government offered to put Lawrence's counsel on the stand to confirm the plea deal.  The district court acknowledged that the

government "screwed [the plea agreement] up," but stressed that "the point is that [Lawrence] cannot get less than 15 years in this case." Booker's counsel indicated he was finished with the witness, and the bench conference concluded.

The government also called Officer Jeff Fitzgerald, with the Athens-Clarke County Police Department FBI Task Force, as an expert witness in the area of narcotics, distribution, patterns of distribution, value of narcotics, tools of the trade, and coded language. Fitzgerald had worked in law enforcement in the Athens area for 34 years, most of that time in the narcotics unit.

Officer Fitzgerald testified in his expert opinion that: (1) the amounts of marijuana, alprazolam, and methamphetamine pills seized during the traffic stop were distribution amounts, not personal use amounts; (2) drug dealers often protect themselves with firearms; (3) drug dealers will "front" the drugs to someone who sells them and then collect the money owed from the drug proceeds; and (4) the piece of paper found in the backpack looked like a drug ledger.

Without objection from Booker, Officer Fitzgerald testified that he recognized several nicknames in the drug ledger. Consistent with Lawrence's testimony, Fitzgerald identified "Big B" as Antron Bishop, whom Fitzgerald said he had prosecuted in federal court. Fitzgerald opined the "30,100" next to Bishop's nickname was probably a dollar amount.

When Officer Fitzgerald stated that the nickname "Lil D" could be one of two different people, Booker's counsel objected

that Fitzgerald was speculating. The district court ruled that Fitzgerald could testify about the name if the government laid a foundation for his personal knowledge. Fitzgerald testified that he had dealt with two individuals in the Athens area who were involved in narcotics distribution and went by the name "Little D," Darren Thrasher and Derek Franklin. Fitzgerald confirmed that he had prosecuted Thrasher in "federal court for narcotics cases."

Without any further objection from Booker, Officer Fitzgerald identified: (1) "Ham," as DaRico Ham, who was known to distribute narcotics in the Athens-Clarke County area; (2) "Charlie" as Gerrick Cooper, one of the codefendants in the instant case; (3) "Sug" as Sherwin Howard, an individual who distributes narcotics in the area who was prosecuted in federal court; (4) "Jok" as "probably Jason Burgess"; and (5) "Sik" as Royrecus Cunningham. Fitzgerald also stated, in his expert opinion, that the amounts of money listed in the ledger were consistent with distribution of narcotics and that the notation "gummies" next to one name was "probably gummies that have THC in them."

Next, the government introduced evidence about Booker's drug possession in 2016 and his convictions. First though, the district court gave the jury thorough limiting instructions as to prior acts, as follows:

> Ladies and gentlemen of the jury, you will hear evidence of acts allegedly done by the Defendant on other occasions that may be similar to the acts with

which the Defendant is currently charged.  You must not consider evidence of a prior act to determine whether the Defendant engaged in the activity alleged in the indictment.

The evidence is admitted and may be considered by you for the limited purpose of assisting you in determining whether the Defendant had the state of mind or intent necessary to commit the crime charged in the indictment or crimes charged in the indictment or whether the Defendant committed the acts in the indictment by accident or mistake.

The Defendant is currently on trial only for the crimes charged in the indictment.  You may not convict a person simply because you believe that person may have committed an act in the past that is not charged in the indictment.

After these instructions, Georgia Bureau of Investigation Task Force Agent Adam Ashworth testified about executing a search warrant at Booker's residence back on August 10, 2016 and finding a large quantity of marijuana (approximately 1,010.2 grams) and another substance suspected to be cocaine, but later determined to be bath salts.

After Agent Ashworth's testimony, the government submitted a certified copy of Booker's state drug convictions in 2022, that were based on this 2016 drug conduct.  The prosecutor described the certified document as "a guilty plea and conviction

to Count One, possession of a Schedule I controlled substance, bath salts; . . . Count Two, possession of a Schedule II controlled substance, methamphetamine or amphetamine; and Count Three, possession of marijuana with intent to distribute." After Booker's counsel had no objection, the district court admitted the certified document. Nothing was said about *Alford* or Booker's guilty plea being made pursuant to *Alford*.

Before resting, the government introduced stipulations by the parties that (1) Booker was a convicted felon at the time of the offense and was aware of his convicted felon status, and (2) the firearm in the glove box had traveled in and affected interstate commerce.

Booker did not call any witnesses. Booker submitted, *inter alia*, copies of his prescription records between January 2018 and December 2019. Those records showed that Booker was prescribed 10-miligram and 30-milligram pills of oxycodone during this period.

## C.    Verdict and Sentence

During the jury charge, the district court reiterated its limiting instructions as to the Rule 404(b) prior acts evidence. The district court asked the parties if there were any new objections to the jury instructions, and the parties responded there were not.

The jury found Booker guilty on all counts. The district court sentenced Booker to separate 125-month terms on Counts 6, 9, and 11, a 111-month term on Count 10, and a 60-month term on Count 7, all to run concurrently to each other, and a 60-month

term on Count 12, to run consecutively to all other sentences, for a total term of 185 months' imprisonment, followed by five years of supervised release.  This appeal followed.

## II.  RULE 404(b) EVIDENCE

On appeal, Booker does not challenge the admission of Agent Ashworth's testimony about executing the search warrant at Booker's residence in 2016 and seizing 1,010.2 grams of marijuana and the bath salts.  Rather, Booker challenges the denial of his motion *in limine* as to evidence of his state drug convictions.  Ultimately, by agreement, the certified conviction document did not go to the jury room.  The jury thus heard only the prosecutor's statement describing the document as a "guilty plea and conviction" to possession of "bath salts" and "methamphetamine or amphetamine" and possession with intent to distribute "marijuana."[2]

### A.    Booker's Motion *In Limine*

Pretrial, the government filed a Rule 404(b) notice of intent to introduce, as evidence of Booker's intent, knowledge, and lack of mistake or accident, (1) Agent Ashworth's testimony, and (2) Booker's guilty pleas and drug convictions in state court.

---

[2] The certified document in the record contains the change of plea form signed by Booker.  The form describes the plea as "Guilty" to the named drug charges, but it does have "ALFORD" handwritten next to each plea.  So for purposes of this opinion, we accept that Booker's guilty plea was made pursuant to *Alford*.

Booker filed a motion *in limine*, contending his state drug convictions were not admissible because they were *Alford* pleas.

The district court denied Booker's motion *in limine*. In its order, the district court concluded, *inter alia*, that: (1) prosecutors can demonstrate a defendant's intent to distribute drugs in the present case by demonstrating the defendant distributed drugs in the past; (2) the government had established Booker's state drug convictions were relevant to an issue other than his character; and (3) Booker's guilty pleas, even if made under *Alford*, and convictions were sufficient proof for a jury to find by a preponderance of the evidence that Booker committed the prior acts. The district court further concluded the probative value of the state drug conviction evidence was not substantially outweighed by undue prejudice under Rule 403.[3]

The district court, however, granted Booker's motion *in limine* as to Booker's 2015 arrest for possession with intent to distribute 70 pills of MDMA. Other people were in the car with Booker at the scene, and Booker was never charged or indicted for this 2015 drug crime.[4] The district court ruled that there was insufficient proof that Booker committed these prior acts in 2015

---

[3]Booker moved for reconsideration because he had now agreed not to submit evidence of a mistake-of-law defense as to his marijuana possession charge. The district court orally denied the motion, reasoning that Booker's intent to distribute was still "clearly an issue in this case."

[4] Booker asserted Fourth Amendment violations as to this 2015 arrest.

and the probative value of the prosecutor's evidence failed to overcome the substantial prejudice.

## B.     Legal Principles

We review the admission of evidence under Rule 404(b) for abuse of discretion. *United States v. Culver*, 598 F.3d 740, 747 (11th Cir. 2010). We review Rule 404(b) errors for harmlessness. *United States v. Cenephat*, 115 F.4th 1359, 1364 (11th Cir. 2024), *cert. denied*, 2025 WL 746365 (U.S. Mar. 10, 2025). Evidence admitted in violation of Rule 404(b) is harmless where the government shows it "had no substantial influence on the outcome and sufficient evidence uninfected by error supports the verdict." *Id.* (quotation marks omitted).

Under Rule 404(b), evidence of other "crimes, wrongs, or act[s]" are "not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Such evidence may be admissible for other purposes, however, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Because Rule 404(b) is "a rule of inclusion," Rule 404(b) evidence "should not be lightly excluded when it is central to the prosecution's case." *United States v. Kapordelis*, 569 F.3d 1291, 1313 (11th Cir. 2009) (quotation marks omitted).

Under our three-part test, evidence of other acts is admissible if: (1) the evidence is relevant to an issue other than the defendant's character; (2) there is sufficient proof to allow a jury to

find by a preponderance of the evidence that the defendant committed the prior act; and (3) the probative value of the evidence is not substantially outweighed by the risk of unfair prejudice under Rule 403. *Cenephat*, 115 F.4th at 1365.

## C.    Analysis

The district court did not abuse its discretion in admitting evidence of Booker's 2022 guilty pleas and state drug convictions (based on his 2016 offense conduct) as this evidence satisfied all three prongs of the test for admissibility. As to the first prong, by pleading not guilty to the instant drug crimes, Booker placed his intent at issue and put the government to its burden to prove the intent-to-distribute element beyond a reasonable doubt. *See United States v. Jones*, 913 F.2d 1552, 1566 (11th Cir. 1990). Indeed, one of Booker's defenses at trial—that the government's evidence did not prove he intended to distribute, as opposed to personally use, the marijuana found in his backpack—particularly put in issue his intent to distribute.

As to the second prong, for purposes of Rule 404(b), a conviction based on a guilty plea to the prior crime is sufficient proof for the jury to find by a preponderance of the evidence that Booker possessed marijuana with intent to distribute. *See United States v. Calderon*, 127 F.3d 1314, 1331-32 (11th Cir. 1997). In addition, Agent Ashworth also testified about executing the search warrant at Booker's residence and recovering 1,010.2 grams of marijuana and the bath salts that were the subject of Booker's guilty pleas and convictions.

As to the third prong, this Court repeatedly has held that evidence of prior drug dealing is highly probative of intent to distribute a controlled substance and that such evidence is not overly prejudicial.  *See United States v. Perry*, 14 F.4th 1253, 1275 (11th Cir. 2021); *United States v. Cardenas*, 895 F.2d 1338, 1344 (11th Cir. 1990); *United States v. Smith*, 741 F.3d 1211, 1226 (11th Cir. 2013).  Here, after conducting the Rule 403 balancing test, the district court did not abuse its discretion in concluding that the probative value of Booker's guilty pleas and state drug convictions was not substantially outweighed by any prejudicial effects, especially in light of its limiting instructions.  *See United States v. Edouard*, 485 F.3d 1324, 1346 (11th Cir. 2007).

To avoid this result, Booker argues his guilty pleas made under *Alford* (1) should not be treated like a guilty plea but (2) should be treated like a *nolo* plea.  However, Booker ignores that both federal and Georgia law treat *Alford* pleas like guilty pleas and not like *nolo* pleas.  This is because, *inter alia*, a guilty plea based on *Alford*, like an ordinary guilty plea, must be supported by a factual basis of guilt for the plea to be accepted by the trial court, but there is no similar requirement for *nolo* pleas.

For starters, as to federal law, Federal Rule of Criminal Procedure 11(b)(3) is entitled "Determining the Factual Basis for a Plea" and provides: "Before entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea."  Fed. R. Crim P. 11(b)(3).  The Supreme Court in *Alford* explained that Rule 11 requires "that a court cannot accept a guilty plea 'unless it

is satisfied there is a factual basis for the plea'; there is no similar requirement for pleas of nolo contendere, since it was thought desirable to permit defendants to plead nolo without making any inquiry into their actual guilt." *North Carolina v. Alford*, 400 U.S. 25, 35 n.8 (1970) (quoting Fed. R. Crim. P. 11 advisory comm. notes to 1966 amends.).[5]  "An *Alford* plea is a guilty plea where the defendant maintains a claim of innocence to the underlying criminal conduct charged but admits that sufficient evidence exists to convict him of the offense." *United States v. Ramirez-Gonzalez*, 755 F.3d 1267, 1273 (11th Cir. 2014) (citing *Alford*, 400 U.S. at 37-38, and discussing a Georgia enticing-a-minor conviction).

Similarly, under Georgia law, to accept a guilty plea under *Alford*, the trial court, *inter alia*, must "inquire[] into the factual basis for the plea and [seek] to resolve the conflict between the plea and the claim of innocence." *McKiernan v. State*, 702 S.E.2d 170, 172 (Ga. 2010).  As this Court has said, "[u]nder Georgia law, an *Alford* plea is 'a guilty plea and places the defendant in the same position as if there had been a trial and conviction by a jury.'" *Ramirez-Gonzalez*, 755 F.3d at 1273 (quoting *Morrell v. State*, 677 S.E.2d 771, 772 n.3 (Ga. Ct. App. 2009)); *see also McKiernan*, 702 S.E.2d at 172.

This Court also has explained that an *Alford* guilty plea, "with its intrinsic admission of each element of the crime, . . .

---

[5] The current notes similarly state: "For a variety of reasons it is desirable in some cases to permit entry of judgment upon a plea of nolo contendere without inquiry into the factual basis for the plea."  Fed. R. Crim. P. 11 advisory comm. notes to 1966 amends.

triggers the collateral consequences attending that plea" that "may not be avoided by an assertion of innocence," as long as the guilty plea was "a voluntary and intelligent choice among alternative courses of action open to the defendant" and "a sufficient factual basis exists to support the plea of guilt." *Blohm v. Comm'r of Internal Revenue*, 994 F.2d 1542, 1554 (11th Cir. 1993) (holding taxpayer was collaterally estopped from denying civil fraud liability because he had entered an *Alford* plea to criminal tax fraud). Booker has never claimed (1) his guilty pleas were not voluntary and knowing or that (2) there was an insufficient factual basis of actual guilt for his guilty pleas under *Alford*.

In sum, guilty pleas under *Alford* require a factual basis showing a defendant's guilt of the prior acts and thus are sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the prior acts that were the subject of the guilty pleas and convictions. In addition to Booker's guilty pleas under *Alford*, we have even more evidence of the prior acts because Agent Ashworth testified, without objection, to his seizure of 1,010.2 grams of marijuana and bath salts at Booker's residence that underlay Booker's prior pleas and convictions.

We recognize that Booker cites our decision in *United States v. Green*, 873 F.3d 846 (11th Cir. 2017). Booker's reliance on *Green* is misplaced. Our *Green* decision (1) addressed a conviction based on a plea of *nolo contendere* and (2) explicitly acknowledged that a *nolo* plea is distinct from a guilty plea for Rule 404(b) purposes. *Id.* at 865. *Green* explained that, unlike a guilty plea, a *nolo* plea cannot

"serv[e] as the basis for proving the defendant committed the particular prior act at issue" because a prosecutor generally is not required to show a factual basis for a *nolo* plea. *Id.* at 865-66 & n.11. As this Court explained in *Green*, "had Defendant's prior conviction been based on a plea of guilty, that would be the end of any discussion as to whether the Government had sufficiently proved the prior act." *Id.* at 865.

Given this particular record, Booker has not shown that the district court abused its discretion as to Rule 404(b).

### D.    Harmless Error

Alternatively, even assuming *arguendo* that the district court abused its discretion by admitting Booker's guilty pleas and state drug convictions, that error was harmless given (1) the overwhelming evidence of Booker's guilt as to the instant four § 841(a) drug counts (Counts Six, Seven, Nine, and Eleven); and (2) Agent Ashworth's testimony about executing the search warrant and finding the distribution amount of marijuana at Booker's residence on August 10, 2016. *See Cenephat*, 115 F.4th at 1364.

To convict Booker of possession with intent to distribute a controlled substance under 21 U.S.C. § 841(a), the government had to prove: (1) knowledge; (2) possession; and (3) intent to distribute. *United States v. Amede*, 977 F.3d 1086, 1099 (11th Cir. 2020).

As to the first two elements, ample evidence established that Booker knowingly possessed the methamphetamine, marijuana, alprazolam, and oxycodone with the intent to distribute them. Codefendant Lawrence testified that (1) Booker frequently went to

Athens to sell drugs; (2) Booker was in possession of the marijuana, alprazolam, and methamphetamine when they started their trip to Athens on September 22, 2019; (3) Booker owned the truck where the drugs (including the oxycodone) were found; (4) he was driving Booker to Athens to collect drug debts arising from prior distributions; and (5) the handwritten ledger found in the backpack in fact was Booker's drug ledger showing amounts owed by some of his drug customers.  Consistent with Lawrence's testimony, both officers testified Booker admitted ownership of the backpack and its drug contents.

Booker's intent to distribute the drugs was also established by: (1) the amounts of drugs—which Officer Fitzgerald testified were "distribution amounts"; (2) the way the drugs were packaged in "corner baggies," which both Trooper Moremen and Officer Fitzgerald explained is how drug dealers often store their drugs; and (3) the proximity of the drugs to the handwritten drug ledger, often used by drug dealers who "front" drugs to customers and then are repaid from the proceeds. *See United States v. Laines*, 69 F.4th 1221, 1229-30 (11th Cir. 2023), *cert denied*, 114 S. Ct. 2611 (2024) (stating a jury may find the intent to distribute from the large amount of drugs and the existence of the implements of drug distribution, such as the drug ledger and the "division of drugs into small bags").

In light of this overwhelming evidence that Booker intended to distribute the controlled substances he knowingly possessed on September 22, 2019, we have no trouble concluding that the

admission of Booker's state drug convictions based on *Alford* pleas "had no substantial influence on" the jury's guilty verdict on Counts Six, Seven, Nine, and Eleven.  *See Cenephat*, 115 F.4th at 1364.

### III.  JUROR BIAS CLAIM

For the first time on appeal, Booker argues that the district court violated his Sixth Amendment right to an impartial jury when it failed to question *sua sponte* Juror 42 about possible bias. While we ordinarily review this juror issue for abuse of discretion, our review is for plain error because Booker did not raise this juror issue in the district court.  *See United States v. Simmons*, 961 F.2d 183, 185 (11th Cir. 1992); *United States v. Kelly*, 749 F.2d 1541, 1552 (11th Cir. 1985).

Here is what Juror 42 briefly said.  After jury selection but before the trial began, Juror 42 spoke with the courtroom deputy in front of the other jurors about a bracelet Booker was wearing. Juror 42 suggested the bracelet may have been made by Booker's daughter.  When the courtroom deputy asked Juror 42, "Did it make you uncomfortable?" Juror 42 stated that at her work in a hospital she sees "*some bracelets*" that are religious and "have to do with voodoo."  (Emphasis added.)  The courtroom deputy then "shut [Juror 42] down" and, outside the jury's presence, advised the district court and the parties of the conversation.

Without objection, the government told the court that Booker's bracelet was associated with a Western African religion called Ifá.  The district court asked the courtroom deputy whether

23-14041                 Opinion of the Court                      21

Juror 42 had stated that she knew Booker's bracelet "was voodoo or witchcraft or something like that." The courtroom deputy clarified that Juror 42 merely discussed "some bracelets" she had seen, did not definitively state that Booker's bracelet had to do with voodoo, and did not know what kind of bracelet Booker was wearing. The district court concluded that nothing needed to be done about Juror 42's comment. Although the district court asked for the parties' "thoughts or recommendations," Booker's attorney offered none and did not object to Juror 42's comment or ask the district court to investigate further.

A district court may remove and replace a seated juror before deliberations begin whenever facts arise that cast doubt on the juror's ability to perform his or her duties. *United States v. Godwin*, 765 F.3d 1306, 1316 (11th Cir. 2014); *see also* Fed. R. Crim. P 24(c). A juror's actual bias can come to light either "by express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias must be presumed." *United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976).[6] That said, the district court's broad discretion in investigating juror bias and misconduct "extends even to the initial decision of whether to interrogate the jurors." *United States v. Yonn*, 702 F.2d 1341, 1345 (11th Cir. 1983).

---

[6] This Court adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

22                    Opinion of the Court                    23-14041

On this record, we cannot say the district court abused its considerable discretion, much less plainly erred, by failing to question Juror 42 about possible bias. As the district court confirmed with the courtroom deputy, Juror 42 merely discussed some bracelets at work, did not know what kind of bracelet Booker was wearing, and did not state that she knew Booker's bracelet was a religious bracelet. She never stated she was uncomfortable because of the bracelet. None of Juror 42's comments implied that she would be biased against Booker. The circumstances, taken as a whole, did not indicate a "reasonable possibility" that Juror 42 was biased against Booker because of his bracelet such that the district court was required to *sua sponte* investigate further and question Juror 42 directly.

## IV. BOOKER'S PROPOSED JURY INSTRUCTION

During trial, Booker submitted a proposed supplemental jury instruction on the meaning of an *Alford* plea. The district court denied Booker's request. We review a district court's rejection of a proposed jury instruction for an abuse of discretion. *United States v. Moore*, 115 F.4th 1370, 1374 (11th Cir. 2024).

In refusing to give an *Alford* instruction, the district court explained that an *Alford* plea is a guilty plea and has the same collateral consequences as an ordinary guilty plea so long as it "represents a voluntary and intelligent choice among alternative courses of action available to the defendant and a sufficient factual basis exists to support the plea of guilty." Later, the district court considered redacting the word "Alford" from the certified

convictions document but then the parties agreed that the certified convictions document would not go back to the jury.  So the jury was never told that Booker's guilty plea was pursuant to *Alford*, and thus the district court did not abuse its discretion in not giving an *Alford* instruction.  Booker has shown no error for this reason alone.

In any event, Booker concedes his proposed *Alford* jury instruction is not in the record.  The record is thus insufficient for us to review the substance of the proposed instruction.  *See Pensacola Motor Sales, Inc. v. E. Shore Toyota, LLC*, 684 F.3d 1211, 1224 (11th Cir. 2012); *see also* Fed. R. App. P. 10(b)(1)-(2).

## V.  IMPROPER VOUCHING CLAIM

Booker contends the prosecutor twice improperly vouched for codefendant Lawrence's credibility, first "on redirect" of Lawrence and again during closing argument.

We ordinarily review *de novo* claims of prosecutorial misconduct, but where, as here, the defendant failed to make a contemporaneous objection, our review is for plain error only. *United States v. Bailey*, 123 F.3d 1381, 1400 (11th Cir. 1997) (closing argument); *United States v. Eyster*, 948 F.2d 1196, 1206 n.14 (11th Cir. 1991) (witness examination).

"Ordinarily, it is improper for a prosecutor to bolster a witness's testimony by vouching for that witness's credibility." *United States v. Maradiaga*, 987 F.3d 1315, 1327 (11th Cir. 2021) (quotation marks omitted).  A prosecutor's comments are considered improper vouching either "(1) by placing the prestige of the government behind the witness, or (2) by indicating that

information not before the jury supports the witness's credibility." *Id.* (quotation marks omitted).  The prohibition on vouching does not "prevent the prosecutor from commenting on a witness's credibility, which can be central to the government's case," if "the prosecutor makes it clear that the conclusions he is urging are conclusions to be drawn from the evidence." *Id.* (cleaned up and quotation marks omitted).

There is no merit to Booker's argument that the prosecutor improperly vouched for Lawrence's credibility.  Booker points to the prosecutor's redirect asking Lawrence if the prosecutor and Lawrence's defense counsel "came to an agreement" that Lawrence would "have to serve 15 years" and that the government would not file a 5K motion on his behalf.  Lawrence agreed.

This challenged question was fully consistent with Lawrence's earlier testimony, on both direct and cross examination, that by entering a guilty plea to his firearm offense, he faced at least a 15-year sentence and that his "plea deal" did not give him the "ability to have a lower sentence" than the 15-year minimum.  The challenged question did not extend any personal assurances of Lawrence's veracity or indicate that information not presented to the jury supported his testimony.

Booker points out that his defense counsel "noted that the written agreement provided for a sentence reduction based on cooperation" and that "the government told the court that 'the [cooperation] language was left in there by mistake.'"  While this is true, this exchange occurred during a bench conference *outside* the

jury's hearing.  Contrary to Booker's claims, the jury never heard any prosecutorial comments or testimony from Lawrence about an error in Lawrence's written plea agreement, and the jury was not "left to believe that defense counsel misrepresented [Lawrence's] plea agreement."

Booker's reliance on *Eyster* is also misplaced.  In *Eyster*, on the defense's cross examination the government's cooperating witness admitted that he had perjured himself by pleading guilty to Count 7 in the indictment, a crime he did not commit, in order to obtain the benefit of a plea deal.  948 F.2d at 1202-03.  On redirect, the prosecutor's questions sought to rehabilitate the witness "[b]y suggesting to the jury that [the witness] did not actually mean to plead to Count 7, but rather meant to plead to Count 9, and that his plea was the result of a typographical error."  *Id.* at 1207.  This Court concluded that the prosecutor's suggestion, "without having any evidence to that effect," constituted impermissible vouching because it "threw the weight of her office behind the witness'[s] testimony and implicitly vouched for the witness by indicating that information not before the jury supported [the witness's] credibility."  Here, the prosecutor elicited no such testimony from Lawrence.[7]

---

[7] The record also belies Booker's claim that his defense counsel was "prevented" from thoroughly cross-examining Lawrence about the plea agreement.  Although Lawrence's written plea agreement was admitted into evidence on direct examination, defense counsel on cross examination did not attempt to impeach Lawrence's testimony about its terms.

Booker also points to a portion of the prosecutor's closing argument that addressed Lawrence's credibility, which we quote:

> That gun in that glove box that Peter Lawrence told you—and Peter Lawrence, you can judge his credibility.  The judge is going to instruct you on credibility.   You want to believe that Peter Lawrence—*he is facing a 15-year minimum in prison*—and parole, there is no parole in the federal system—to life in prison—that he's going to take the stand when he is sitting five feet away from the man who is going to decide his fate, that he's going to lie to you. Peter Lawrence said he takes that gun out and he hands it to the Defendant and the Defendant puts it in the glove box.  Where was the Defendant seated? As a convicted felon on notice that he cannot possess a firearm, he is seated in his truck—this isn't Peter Lawrence's truck—his truck, right in front of where that gun was found.  You get to judge credibility.

(Emphasis added.)   Once again, contrary to Booker's claims, the prosecutor's comments did not express his personal opinion of the veracity of Lawrence's testimony or refer to any information not presented to the jury.  Rather, the conclusion the prosecutor urged on the jury—that Lawrence was disincentivized to lie on the stand because the district court had not yet sentenced him—was drawn from Lawrence's own testimony that he had just pled guilty to his firearm offense the week before trial and faced a sentence of at least 15 years and up to life in prison.  Accordingly, the prosecutor's comments during closing argument about the credibility of

Lawrence's testimony that he handed the gun to Booker did not amount to improper vouching. *See Maradiaga*, 987 F.3d at 1327.

## VI.  OFFICER FITZGERALD'S DRUG LEDGER TESTIMONY

Booker challenges Officer Fitzgerald's testimony connecting some of the nicknames in Booker's drug ledger to drug dealers in the Athens area.  Booker contends the government improperly elicited, and the district court improperly allowed, Officer Fitzgerald's testimony because it: (1) exceeded the categories for which Fitzgerald was designated an expert, (2) invaded the province of the jury by interpreting words in the ledger within the jury's understanding, and (3) was based on speculation and information not presented to the jury.

Ordinarily, we review a district court's rulings on the admissibility of trial testimony for an abuse of discretion. *United States v. Hawkins*, 934 F.3d 1251, 1264 (11th Cir. 2019).  The government argues, and we agree, that Booker's sole objection—that one particular question posed to Officer Fitzgerald called for speculation—did not sufficiently preserve the broader admissibility issue he now raises on appeal.  Thus, we review only for plain error. *See id.*

Booker has not shown plain error with respect to Officer Fitzgerald's testimony.  Although Officer Fitzgerald was qualified as an expert witness, his testimony about the nicknames appearing in the drug ledger was not based on scientific or technical knowledge and thus was not expert testimony under Federal Rule of Evidence 702. *See United States v. Gbenedio*, 95 F.4th 1319, 1332

(11th Cir. 2024) (stating we examine the basis for an opinion to determine whether it is lay or expert); Fed. R. Evid. 702. Rather, Fitzgerald's testimony about his familiarity with some of the nicknames in the drug ledger was based on his professional experience investigating and prosecuting drug crimes with the Athens-Clarke County Police Department's narcotics unit and thus was lay opinion testimony under Federal Rule of Evidence 701. *See United States v. Williams*, 865 F.3d 1328, 1341 (11th Cir. 2017); Fed. R. Evid. 701 (providing lay opinion testimony must, *inter alia*, be "rationally based on witness's perception" and not on "scientific, technical, or other specialized knowledge").

Testimony that is not based on specialized knowledge but on "particularized knowledge garnered from years of experience within the field" may be tendered as lay opinion. *Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*, 320 F.3d 1213, 1223 (11th Cir. 2003). For this reason, we have repeatedly held that law enforcement officers with sufficient experience may offer lay opinion testimony about code words and nicknames used by criminals. *See, e.g.*, *United States v. Novaton*, 271 F.3d 968, 1008-09 (11th Cir. 2001); *United States v. Jayyousi*, 657 F.3d 1085, 1102 (11th Cir. 2011); *United States v. Graham*, 123 F.4th 1197, 1259-60 (11th Cir. 2024).

Given our precedent, Booker has not shown error, much less plain error, in allowing Officer Fitzgerald to testify, based on his personal knowledge and decades of professional experience, that he recognized some nicknames in the handwritten ledger and

that these individuals were drug dealers in the Athens area, some of whom Fitzgerald personally had prosecuted for drug crimes.

While the district court must ensure that a "dual capacity" witness's lay opinions satisfy Rule 701, *see Graham*, 123 F.4th at 1259, Booker has not shown here that Officer Fitzgerald's lay opinion testimony ran afoul of Rule 701. Booker's suggestion that Fitzgerald's testimony was not helpful to the jury is without merit. *See* Fed. R. Evid. 701 (providing lay opinion must be "helpful to clearly understanding the witness's testimony or to determining a fact in issue"). Whether the handwritten list of nicknames and amounts found in Booker's wallet was a ledger of drug debts was a fact in issue, and Officer Fitzgerald's testimony about the nicknames was helpful in making that determination.

Booker relies on *United States v. Hawkins*, 934 F.3d 1251, 1264 (11th Cir. 2019), but the improper opinion testimony in *Hawkins* was nothing like Officer Fitzgerald's testimony here. The witness in *Hawkins*, in addition to being an expert on drug codes and jargon, was the lead case agent and government's principal witness. 934 F.3d at 1261. "During his extensive time on the witness stand," the agent provided speculative interpretive commentary on the meaning of entire, unambiguous conversations in phone calls and text messages, including opinions about what occurred during and between those communications, and gave a "wholesale interpretation of the evidence," thereby placing "the imprimatur of 'expertise' on his view of the facts of the case." *Id.* at 1261, 1262-64, 1266. *Hawkins* does not help Booker.

In any event, Booker cannot show that admitting Officer Fitzgerald's drug ledger testimony affected his substantial rights. *See id.* at 1267 (explaining a defendant can show an error affected his substantial rights if, "absent the error, there is a reasonable probability of a different result" (quotation marks omitted)). Trooper Moremen and Lawrence also testified about the drug ledger without objection, and Lawrence identified several individuals listed by nickname in the ledger and explained that the amounts listed in the ledger represented the money those individuals owed Booker for drug sales. Booker does not challenge any of this evidence on appeal. Accordingly, any error in permitting Officer Fitzgerald to connect some of the nicknames to drug dealers in Athens did not prejudice Booker.

## VII. CONCLUSION

For all these reasons, we find no reversible error and affirm Booker's convictions.[8]

**AFFIRMED.**

---

[8] Booker does not appeal his sentence.